**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CYNTHIA LEVEN and HARRIS KHAN, individually and on behalf of all others similarly situated, )<br>)<br>)<br>)<br>Plaintiffs, )<br>v. )<br>)<br>STAPLES, INC., USR PARENT INC., )<br>THE STAPLES, INC. COMMITTEE )<br>ON EMPLOYEE BENEFIT PLANS, )<br>THE STAPLES, INC. 401(k) )<br>INVESTMENT COMMITTEE, and )<br>JOHN DOES 1-20, )<br>)<br>Defendants. ) | **CIVIL ACTION NO.:** |

**CLASS ACTION COMPLAINT**

Plaintiffs, Cynthia Leven and Harris Khan ("Plaintiffs"), by and through their attorneys, on behalf of the Staples, Inc. Employees' 401(k) Savings Plan (the "Savings Plan") and the Staples US Retail 401(k) Retirement Plan (the "Retirement Plan") (collectively, the Savings Plan and the Retirement Plan are referred to as the "Plans"[1]), themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, which include Staples, Inc. and its parent company, USR Parent Inc. (collectively Staples, Inc. and USR Parent Inc. are referred to as "Staples" or the "Company"), the Staples, Inc. Committee on Employee Benefit Plans (the "Benefit Committee") and the Staples,

---

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

Inc. 401(k) Investment Committee (the "Investment Committee") (collectively, the Benefit Committee and the Investment Committee are referred to as the "Committees").

2.    The Plans are defined contribution plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Report of Independent Auditors ("Auditor's Report"), attached to 2023 Form 5500 for the Savings Plan, at 7 (The [Savings] Plan is a defined contribution plan under Section 401(k) of the Internal Revenue Code (the "Code"), covering certain employees of Staples, Inc. and its wholly-owned subsidiaries (the "Company"). The [Savings] Plan is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")."); Auditor's Report, attached to 2023 From 5500 for the Retirement Plan, at 7 ("The [Retirement] Plan is a defined contribution plan under Section 401(k) of the Internal Revenue Code (the "Code"), covering employees of US Retail Parent Inc. (the "Company"). The [Retirement] Plan is subject to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")."); *see also* Summary Plan Description Staples US Retail 401(k) Retirement Plan ("Retirement SPD"), at 23 ("The Plan is a 401(k) defined contribution plan with participant-directed investments as described in Section 404(c) of ERISA.").

3.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 2020 WL 1495938, at * 6 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

4.    The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent

process for selecting investment options and service providers." [2] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9. The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

10. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to pay reasonable fees for RKA services with respect to the Plans, and failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11. At all times during the Class Period, the Plans combined had at least one and one-half billion dollars in assets under management. At the Plans' fiscal year end in 2019, the Plans had $1,641,305,705 in assets under management that were/are entrusted to the care of the Plans' fiduciaries. *See* 2019 Form 5500 for the Savings and Retirement Plans, Schedule H, at 2.

12. By 2023, the Plans had $1,805,761,401 combined in assets under management. *See* 2023 Form 5500 for the Savings and Retirement Plans, Schedule H, at 2.

13. The Plans' assets under management qualifies them as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

14. The Plans are also large in terms of the number of its participants. At the beginning of the Class Period, the Plans had combined 26,902 participants. *See* 2019 Form 5500 for the

Savings and Retirement Plans, at 2. By 2023, the Plans had 27,005 participants combined. *See* 2023 Form 5500 for the Savings and Retirement Plans, at 2.

15. The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plans had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the Plans' expenses to ensure they were prudent. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services throughout the Class Period.

16. Defendants also caused the Plans to enter into an arrangement with Great-West Life & Annuity Company ("Great-West"),[4] a party in interest, under which Great-West/Empower received millions of dollars in exchange for recordkeeping services and trustee services rendered to the Plans. Defendants' conduct was especially egregious given that Great-West/Empower received additional income from certain of the Plans' investment securities, described below. This arrangement with Great-West/Empower is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

17. With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

18. Specifically, Defendants allowed substantial assets in the Plans to be invested in the Great-West Stable Value Option, now the Empower Stable Value Option ("Great-

---

[4] Effective August 1, 2022, Great-West Life & Annuity Insurance Company was renamed to Empower Annuity Insurance Company of America ("Empower"). See https://www.empower.com/name-change#:~:text=Finally%2C%20in%20connection%20with%20the,Colorado%2C%20the%20company's%20domicile%20state. (last accessed September 17, 2025).

West/Prudential SVO"). The Great-West/Prudential SVO carried significantly more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants.

19.     Great-West/Prudential benefited significantly from Plan participants being invested in the Great-West/Prudential SVO. The assets invested in the Great-West/Prudential SVO were held and invested by Great-West/Prudential, which kept the spread (the difference between the amount Great-West/Prudential earned on the investments and the amount Great-West/Prudential paid to Plan participants). The crediting rates that Great-West/Prudential provided to investors in the Great-West/Prudential SVO were/are so low that Great-West/Prudential reaped a windfall on the spread.

20.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, (1) failing to objectively and adequately review the Plans' investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) failing to control the Plans' recordkeeping and administration costs; and (3) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

21.      Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

22.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violation of ERISA's prohibited transactions (Count III).

## II.     JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

24.    This Court has personal jurisdiction over Defendants because the Plans are administered in this District, meaning Staples transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process. Further, the Plan administrator, Staples, is located at 500 Staple Drive, Framingham Massachusetts.[5]

25.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Staples does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

26.    Plaintiff, Cynthia Leven ("Leven"), resides in Mendon, Massachusetts. During her employment, Plaintiff Leven participated in the Savings Plan. Ms. Leven invested in the Great-West/Prudential SVO in the Savings Plan and suffered injury to her Plan account due to the significant underperformance of the Great-West/Prudential SVO. In addition, Plaintiff Leven also suffered injury to her Plan account by paying excessive RKA costs.

27.    Plaintiff, Harris Khan ("Khan") resides in Huntley, Illinois. During his employment, Plaintiff Khan participated in the Retirement Plan. Mr. Khan invested in the Great-

---

[5] *See* 2023 Form 5500 for the Savings and Retirement Plans, at 1.

West/Prudential SVO in the Retirement Plan and suffered injury to his Plan account due to the significant underperformance of the Great-West/Prudential SVO. In addition, Plaintiff Khan also suffered injury to his Plan account by paying excessive RKA costs.

28.     Plaintiffs have standing to bring this action on behalf of the Plans because they participated and invested in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

29.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

30.     Staples, Inc. is the plan sponsor for the Savings Plan and a named fiduciary with a principal place of business at 500 Staple Drive, Framingham, Massachusetts. *See* 2023 Form 5500 for the Savings Plan, at 1.

31.     USR Parent Inc., the parent company of Staples, is the plan sponsor for the Retirement Plan and a named fiduciary with a principal place of business at 500 Staple Drive, Framingham, Massachusetts. *See* 2023 Form 5500 for the Retirement Plan, at 1.

32.     Staples is an office supply retail company. "Staples has been the industry leader in workspace products like furniture, technology, cleaning products, and traditional office supplies."[6]

33.     The Plans are administered by the Staples Committee on Employee Benefit Plans and the 401(k) Investment Committee, whose members are appointed by the Company.

---

[6] *See* https://www.staples.com/sbd/cre/noheader/about_us/index.html (last accessed September 17, 2025).

34.    Staples appointed the Investment Committee to, among other things, ensure that the investments available to Plans participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Staples appointed the Benefit Committee to, among other things, ensure that the Plans paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committees fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35.    Accordingly, Staples during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committees.

36.    For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Investment Committee Defendants**

37.    As discussed above, Staples appointed the 401(k) Investment Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers

38.    "The Plan fiduciary in charge of investments is the 401(k) Investment Committee." Retirement SPD, at 23.

39.    The Investment Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

40.    The Investment Committee and unnamed members of the Investment Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Investment Committee Defendants."

**Benefit Committee Defendants**

41.     As discussed above, Staples appointed the Benefit Committee to ensure that the Plans paid a fair price for recordkeeping and administrative services.

42.     "The Committee on Employee Benefit Plans serves as the Plan Administrator. The Plan Administrator may be contacted at the Plan Sponsor's address and phone number shown above." Retirement SPD, at 23.

43.     The Benefit Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

44.     The Benefit Committee and unnamed members of the Benefit Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Benefit Committee Defendants."

## IV.     CLASS ACTION ALLEGATIONS[7]

45.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Staples, Inc. Employees' 401(k) Savings Plan or the Staples US Retail 401(k) Retirement Plan, at any time between September 25, 2019 through the date of judgment (the "Class Period").

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plans and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

46.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 for the Savings Plan lists 19,202 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 for the Savings Plan, at 2. The 2023 Form 5500 for the Retirement Plan lists 7,803 Plan "participants with account balances as of the end of the plan year." 2023 Form 5500 for the Retirement Plan, at 2.

47.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members and managed the Plans as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

48.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.    Whether Defendants are/were fiduciaries of the Plans;
>
> B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.    Whether the Company failed to adequately monitor the Committees and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;
>
> D.    The proper form of equitable and injunctive relief; and
>
> E.    The proper measure of monetary relief.

49.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no

11

interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

50.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

51.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLANS

### The Savings Plan

52.     The Savings Plan is a defined contribution plan covering substantially all eligible employees of the Company. *See* Auditor's Report, attached to 2023 Form 5500 for the Savings Plan, at 7. ("All U.S. employees ("associates") of the Company, except for those covered by a collective bargaining agreement (the terms of which provide for participation in the Plan), are eligible to participate in the Plan.").

53.     Included in the Savings Plan's available funds was the Stable Value Option offered by Empower Annuity Insurance Company (formerly known as Great-West Life & Annuity Company), "which is a fully benefit responsible investment contract, stated at contract value. …

The [Great-West/Empower SVO] is a group annuity contract fully backed by the assets of [Great-West]/Empower." *Id.*, at 9.

54.    The Great-West/Empower SVO is "a traditional investment contract." *Id.*, at 11.

55.    At the end of 2019, $109,215,382 in Savings Plan assets were invested in the Great-West/Empower SVO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Savings Plan, at 13.

56.    At the end of 2023, over $101 million in Savings Plan assets were invested in the Great-West/Empower SVO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Savings Plan, at 14.

57.    The chart below demonstrates the amount of Savings Plan assets invested in the Great-West/Empower SVO during the Class Period.

| Plan Year | Savings Plan Assets in Great-West/Empower SVO |
|---|---|
| 2019 | $109,215,382 |
| 2020 | $123,375,042 |
| 2021 | $113,939,060 |
| 2022 | $119,852,514 |
| 2023 | $101,791,865 |

*Contributions*

58.    "All non-highly compensated participants may contribute from 1% up to 100% of their eligible compensation on a pre- or post-tax (Roth) basis, within limits prescribed by Section 401(k) of the Code. All highly compensated participants may contribute amounts as described and limited in the Plan Document." Auditor's Report, attached to 2023 Form 5500 for the Savings Plan, at 7.

59.    "The Company matches 50% of employee contributions, not to exceed 6% of the participant's compensation." *Id.*, at 8.

**The Retirement Plan**

13

60.     The Retirement Plan is a defined contribution plan covering substantially all eligible employees of the Company. *See* Auditor's Report, attached to 2023 Form 5500 for the Retirement Plan, at 7. ("All U.S. employees ("associates") of the Company, except for those covered by a collective bargaining agreement (the terms of which provide for participation in the Plan), are eligible to participate in the Plan.").

61.     Included in the Retirement Plan's available funds was the Stable Value Option offered by Empower Annuity Insurance Company (formerly known as Great-West Life & Annuity Company), "which is a fully benefit responsible investment contract, stated at contract value. … The [Great-West/Empower SVO] is a group annuity contract fully backed by the assets of [Grea-West]/Empower." *Id*., at 9.

62.     The Great-West/Empower SVO is "a traditional investment contract." *Id*., at 11.

63.     At the end of 2019, $19,140,544 in Retirement Plan assets were invested in the Great-West/Empower SVO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Retirement Plan, at 14.

64.     At the end of 2023, over $20 million in Retirement Plan assets were invested in the Great-West/Empower SVO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Retirement Plan, at 14.

65.     The chart below demonstrates the amount of Retirement Plan assets invested in the Great-West/Empower SVO during the Class Period.

| Plan Year | Retirement Plan Assets in Great-West/Empower SVO |
|---|---|
| 2019 | $19,140,544 |
| 2020 | $22,321,752 |
| 2021 | $21,060,291 |
| 2022 | $21,640,884 |
| 2023 | $20,798,039 |

14

66.     Like other companies that sponsor 401(k) plans for their employees, Staples enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

67.     Staples also benefits in other ways from the Plans' matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

68.     Given the size of the Plans, Staples likely enjoyed significant tax and cost savings from offering a match.

## VI.  THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLANS IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

69.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

70.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

15

71.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

72.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

73.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

74.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

75.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

76.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

77.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

78.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

79.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

80.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

81.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

82.     In fact, in an attempt to discover the details of the Plans' mismanagement, Plaintiffs first wrote to the Plan administrator on January 15, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

83.     Plaintiffs did not receive a response to their initial request pursuant to Section 104(b)(4) of ERISA.[10]

84.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

85.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

86.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Great-West/Empower SVO

---

[10] Failure to provide Plan documents within thirty days of request is a violation of 29 U.S.C. § 1132(c)(1) and 29 U.S.C. § 1024(b)(4). Plaintiffs reserve the right to amend the instant Complaint to add a count for violation of the forgoing ERISA provisions.

in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

## B. Defendants Breached Their Fiduciary Duties by Causing the Plans to Offer the Great-West/Empower SVO

87.    A stable value fund "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[11]  In other words, the overarching goal of all stable value funds is to preserve capital.

88.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[12]

89.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Great-West/Empower SVO; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

90.    "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[13]

91.    As indicated above, the Plans were invested in a proprietary stable value fund managed by Great-West, then Empower, the Great-West/Empower SVO.

---

[11] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[12] *Id*.

[13] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

92.    There are two significant problems with the Great-West/Empower SVO discussed below. First, the Great-West/Empower SVO is a traditional GIC and is structured as a general account, fixed annuity contract. As a general account product, the Great-West/Empower SVO thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

93.    The second related problem with the Great-West/Empower SVO is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

94.    Defendants' selection of the imprudent Great-West/Empower SVO was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.    The Plans' Inclusion of the Great-West/Empower SVO

95.    At all relevant times, Defendants maintained the authority to exercise control over the Plans' investments, including the Plans' Great-West/Empower SVO.

96.    The Auditor's Reports attached to the 2023 Form 5500 for the Savings Plan and the Retirement Plan state as follows

> The Plan holds a traditional investment contract, The Empower Stable Value Option, that meets the fully benefit-responsive investment contract criteria and therefore is reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts, because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan.
>
> […]
>
> The contract issuer is contractually obligated to repay the principal and interest at a specific interest rate that is guaranteed by the Plan. The crediting rate is based on a formula established by the contract issuer, but may not be less than zero. The crediting rate is reviewed on a quarterly basis.
>
> There are certain events that might limit the ability of the Plan to transact at contract value with the contract issuer. Examples of such events include:

the Plan's failure to qualify under Section 401(a) of the Code, premature termination of the contracts by the Plan, Plan termination or merger, bankruptcy of the plan sponsor and changes to the Plan's prohibition on competing investment options. Plan management noted no events that are probable of occurring as of December 31, 2023.

97. For these reasons, the Great-West/Empower SVO's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) do not permit the insurance companies to terminate the agreements before the end of the contract, (3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance carriers. The Great-West/Empower SVO's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Great-West/Empower SVO, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

98. Defendants' selection of the imprudent Great-West/Empower SVO was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**2. There are Many GICs in the Marketplace with Competitive Crediting Rates**

99. The Plans' fiduciaries should not have selected or maintained the Great-West/Empower SVO.

100. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

101. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plans, but were not selected by Defendants.

21

102.   These comparisons include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. Like the Great-West/Empower SVO, "[t]he crediting rates are reviewed quarterly" and, like the Great-West/Empower SVO, "the contracts cannot be terminated before the scheduled maturity date." *Id*. Also like the Great-West/Empower SVO, "[n]o events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract" that is "fully and unconditionally guaranteed by Lincoln National Life Insurance Company." Like the Great-West/Empower SVO, the "[t]he Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020 Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan offered a synthetic GIC with multiple underlying "guaranteed investment contracts[,]" and the GIC cannot be cancelled "before the scheduled maturity dates." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id*., at Line 4i (listing the insurance companies). Like the Great-West/Empower SVO, "[t]he Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)." Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is determined daily" and the "[u]nits are issued and redeemed" daily. *Id*. Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id*., at Schedule H.

- The Jackson National Life Insurance Company Defined Contribution Plan offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id*.

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of

stable fund segments" with each segment have "a guaranteed rate of interest." Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. Like the Great-West/Empower SVO, the interest rate is determined quarterly. *Id.*, at 10. Also, like the Great-West/Empower SVO, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id.*, at 11. "TFLIC is not permitted to pay or transfer the value of the contract, without consent from the Plan, prior to the scheduled maturity date." *Id.*

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract with Lincoln National Life Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The guarantee is based on Lincoln's ability to meet its financial obligations from the general assets of Lincoln." *Id.* "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id.*

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract where the "interest rates are reviewed on a quarterly basis for resetting" and, like the Great-West/Empower SVO, "[t]he Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id.*, at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the Great-West/Empower SVO, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*

- The Auto-Owners Insurance Company Retirement Savings Plan offered a "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the Great-West/Empower SVO, "[t]he plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable", and "The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract[.]" Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc.

Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the Great-West/Empower SVO, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id*. Although "Lincoln Insurance maintain[s] the contributions in a general account fund" it is listed as plan assets. *Id*., at Note 2 and Schedule H. Rates are based on "factors, including economic and market conditions, the general interest rate environment and the expected and actual return on the portfolio within the general account[,]" not risk. *Id*. What Lincoln deemed reflective of the "economic and market conditions" should be the same for the Great-West/Empower SVO during the same "economic and market conditions."

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable" and "Mattel is unaware of any events which occurred during 2023 that would allow contract issuers to terminate the contracts held by the Plan." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered a "a traditional fully benefit-responsive guaranteed investment contract." Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*. "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*. Although "MassMutual maintains the contributions in a general account[,]" *id*., the assets are listed as plan assets. *Id*., at Note 4, Schedule H.

103. The Great-West/Empower SVO in the Plans is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[14] |
|---|---|---|---|---|---|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |

---

[14] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Staples Savings Plan** | **17,900** | **$1,348,946,359** | **Great-West SVO** | **2.31%** |
| | **Staples Retirement Plan** | **9,002** | **$292,359,346** | **Great-West SVO** | **2.32%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Staples Savings Plan** | **17,520** | **$1,475,267,612** | **Great-West SVO** | **2.33%** |
| | **Staples Retirement Plan** | **8,809** | **$340,179,714** | **Great-West SVO** | **2.33%** |

| | | | | | |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Staples Savings Plan** | **19,507** | **$1,613,855,083** | **Great-West SVO** | **1.81%** |
| | **Staples Retirement Plan** | **8,555** | **$389,298,625** | **Great-West SVO** | **1.81%** |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |

| | | | | | |
|---|---|---|---|---|---|
| | **Staples Savings Plan** | **19,350** | **$1,278,341,558** | **Empower SVO** | **1.84%** |
| | **Staples Retirement Plan** | **8,686** | **$318,072,663** | **Empower SVO** | **1.84%** |
| | | | | | |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Staples Savings Plan** | **19,202** | **$1,429,615,857** | **Empower SVO** | **2.14%** |
| | **Staples Retirement Plan** | **7803** | **$376,145,544** | **Empower SVO** | **2.14%** |

104. Throughout the Class Period, the Great-West/Empower SVO in the Savings Plan and the Retirement Plan underperformed the comparator funds by at least 47%, as demonstrated in the tables below.

| Year | Great-West/Empower SVO Rate of Return in the Savings Plan | Comparator Average Rate of Return | Great-West/Empower SVO Percentage of Underperformance in the Savings Plan |
|---|---|---|---|
| 2019 | 2.31% | 3.94% | 41.37% |
| 2020 | 2.33% | 3.75% | 37.87% |
| 2021 | 1.81% | 4.19% | 56.80% |
| 2022 | 1.84% | 4.13% | 55.45% |
| 2023 | 2.14% | 3.85% | 44.42% |
| Average Underperformance during Class Period | | | 47.18% |

| Year | Great-West/Empower SVO Rate of Return in the Retirement Plan | Comparator Average Rate of Return | Great-West/Empower SVO Percentage of Underperformance in the Retirement Plan |
|---|---|---|---|
| 2019 | 2.32% | 3.94% | 41.12% |
| 2020 | 2.33% | 3.75% | 37.87% |
| 2021 | 1.81% | 4.19% | 56.80% |
| 2022 | 1.84% | 4.13% | 55.45% |
| 2023 | 2.14% | 3.85% | 44.42% |
| Average Underperformance during Class Period | | | 47.13% |

105. Notably, in 2021 the Great-West/Empower SVO's crediting rate decreased while the Comparator GIC's crediting rates increased, indicating Defendants' failure to adequately investigate the prevailing marketplace and achieve similar adjustments in the same economy. Subsequent increases were still insufficient to bring the crediting rates in line with the prevailing marketplace and meaningful returns.

106. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Great-West/Empower SVO's dismal crediting rate.

107. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plans to transact at contract value. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Great-West/Empower SVO.

108. In short, because the Plans held between $1.6 billion and $1.8 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

**C. Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the Plans and their Participants**

28

109. During the Class Period, Defendants entered into a contract with Great-West/Empower to provide RKA and trustee services to the Plans. However, such an engagement is a prohibited transaction under ERISA.

110. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

111. Here, Great-West/Empower was a party in interest to the Plans as it was receiving compensation for RKA and trustee services, as well as indirect compensation from the Plans in the form of revenue share being paid to Great-West/Empower from Great-West/Empower funds in the Plan.

### 1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

112. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

113. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plans). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

29

C.      Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.      Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.      Participant tax reporting services (e.g., IRS Form 1099-R);

F.      Participant confirmations, statements, and standard notices;

G.      Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.      Participant education (e.g. newsletters, web articles, standard communication materials);

I.      Plan consulting (e.g., preapproved document services, operational materials);

J.      Plan consulting (e.g. preapproved document services, operational compliance support).

114.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

115.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

      a.      Loan processing;

      b.      Brokerage services/account maintenance (if offered by the plan);

      c.      Distribution services; and

      d.      Processing of qualified domestic relations orders.

116.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

117.    The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[15] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[16]

---

[15] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[16] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

118.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper **notwithstanding the level, number and character of the services provided to that additional participant.**

119.    Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Prudential, Voya, and Empower among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

120.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 2.    The Plans' Recordkeeping Fees were Excessive

121.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

122.    As demonstrated in the charts below, the Plans' participants were saddled with above-market administrative and recordkeeping fees since before the start of the Class Period.

| Plan Year | Savings Plan Participants | Total RKA Reported | $PP |
|---|---|---|---|
| 2017 | 21,924 | $1,669,143 | $76.13 |
| 2018 | 21,503 | $859,516 | $39.97 |
| 2019 | 17,900 | $793,248 | $44.32 |
| 2020 | 17,520 | $766,721 | $43.76 |
| 2021 | 19,507 | $816,540 | $41.86 |

| 2022 | 19,350 | $988,470 | $51.08 |
|------|--------|----------|--------|
| 2023 | 19,202 | $912,149 | $47.50 |

| Plan Year | Retirement Plan Participants | Total RKA Reported | $PP |
|-----------|------------------------------|--------------------|------|
| 2018 | 10,721 | $321,060 | $29.95 |
| 2019 | 9,002 | $543,269 | $60.35 |
| 2020 | 8,809 | $388,791 | $44.14 |
| 2021 | 8,555 | $486,635 | $56.88 |
| 2022 | 8,686 | $535,640 | $61.67 |
| 2023 | 7,803 | $518,745 | $66.48 |

123.    The above fees were excessive when benchmarked against similar plans.

124.    At all times during the Class Period a per participant fee in excess of $41 (the lowest per participant fee in the Retirement Plan from 2019-2023) was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be. To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 401(k) data is BrightScope/ICI. It categorizes plans in the following tranches:

33

EXHIBIT I.3

**BrightScope Audited 401(k) Filings and the Universe of 401(k) Plans by Plan Assets**

Distribution of 401(k) plans, participants, and assets by plan assets, 2019

| Plan assets | BrightScope audited 401(k) filings | | | Department of Labor 401(k) universe | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Plans<br>Number | Participants<br>Thousands | Assets<br>Billions of dollars | Plans<br>Number | Participants<br>Thousands | Assets<br>Billions of dollars |
| Less than $1M | 2,980 | 731.8 | $1.5 | 336,744 | 5,675.6 | $104.7 |
| $1M to $10M | 25,183 | 6,504.8 | 123.2 | 225,598 | 13,607.0 | 691.6 |
| >$10M to $50M | 20,836 | 9,329.2 | 461.7 | 31,260 | 10,248.3 | 631.3 |
| >$50M to $100M | 3,962 | 4,498.4 | 277.2 | 4,213 | 4,659.1 | 294.1 |
| >$100M to $250M | 2,608 | 6,702.8 | 404.8 | 2,724 | 6,937.8 | 423.0 |
| >$250M to $500M | 1,121 | 5,085.3 | 391.5 | 1,176 | 5,293.8 | 410.5 |
| >$500M to $1B | 706 | 5,310.5 | 498.3 | 726 | 5,415.6 | 512.3 |
| More than $1B | 762 | 21,353.8 | 3,030.7 | 776 | 21,557.2 | 3,068.2 |
| All plans | 58,158 | 59,516.4 | 5,188.9 | 603,217 | 73,394.3 | 6,135.6 |

Note: BrightScope audited 401(k) filings generally include plans with 100 participants or more. Plans with fewer than four investment options or more than 100 investment options are excluded from BrightScope audited 401(k) filings for this analysis. Assets are fair market value at the year-end of the plan and include loans.

Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

125.    Accordingly, the more than $1 billion asset mark is significant as all plans have more than $1 billion are considered in a category of their own.

126.    Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plans during the Class Period shows that the Plans were paying higher recordkeeping fees than their peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[17] |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | $939,399,569 | 18,674 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $25 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
| **Great-West** | **Staples Savings Plan** | **2019** | **$1,348,946,359** | **17,900** | **15 37 50 64** | **No** | **$44** |
| **Great-West** | **Staples Retirement Plan** | **2019** | **$292,359,346** | **9,002** | **15 37 50 64** | **No** | **$60** |

[17] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| **Great-West** | **Staples Savings Plan** | **2020** | **$1,475,267,612** | **17,520** | **15 37 50 64** | **Yes - $0** | **$44** |
| **Great-West** | **Staples Retirement Plan** | **2020** | **$340,179,714** | **8,809** | **15 37 50 64** | **Yes - $0** | **$44** |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| **Great-West** | **Staples Savings Plan** | **2021** | **$1,613,855,083** | **19,507** | **15 37 50 64** | **Yes - $0** | **$42** |
| **Great-West** | **Staples Retirement Plan** | **2021** | **$389,298,625** | **8,555** | **15 37 50 64** | **Yes - $0** | **$57** |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37 60 64 65 71 | Yes - $0 | $30 |
| **Empower** | **Staples Savings Plan** | **2022** | **$1,278,341,558** | **19,350** | **15 37 50 64** | **Yes - $0** | **$51** |
| **Empower** | **Staples Retirement Plan** | **2022** | **$318,072,663** | **8,686** | **15 37 50 64** | **Yes - $0** | **$62** |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| **Empower** | **Staples Savings Plan** | **2023** | **$1,429,615,857** | **19,202** | **15 37 50 59 64** | **Yes - $0** | **$48** |

| Empower | Staples Retirement Plan | 2023 | $376,145,544 | 7,803 | 15 37 50 59 64 | Yes - $0 | $66 |

127. The above chart demonstrates that for similar plans, regarding assets and participants, the Plans had some of the highest recordkeeping fees throughout the Class Period.

128. As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Savings Plan's $46 per participant fee is 84% greater than the average fee of $25 per participant for the fourteen (14) plans listed above. The Retirement Plan's $58 per participant fee is 132% greater than the average fee of $25 per participant for the fourteen (14) plans listed above. Combined, the Plans' $52 average per participant fee is 108% greater than the average fee of $25 per participant for the comparator plans.

129. This vast discrepancy between the Plans' RKA fees and comparable plans existed for all years throughout the Class Period. Indeed, the figures in the above chart are just an example of the Plans' excessive RKA fees during the Class Period.

130. The Plans should have been able to obtain per participant recordkeeping fees of no more than $25 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

131. Further, because Great-West/Empower was a party-in-interest and received income from the funds it maintained in the Plans, the Plans' fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Great-West/Empower.

132. Given the size of the Plans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were

36

comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committees)

133. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

134. At all relevant times, the Committees and their members ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

135. As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

136. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Prudence Defendants selected and retained investment options in the Plans despite poor performance in relation to other comparable investments.

137. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Great-West/Empower SVO, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their

37

fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

139.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

140.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

141.    Staples, Inc. and USR Parent Inc. (the "Monitoring Defendants") had the authority to appoint and remove members of the Committees, and the duty to monitor the Committees and was aware that the Committees had critical responsibilities as fiduciaries of the Plans.

142.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committees to ensure that the Committees were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committees were not fulfilling those duties.

143.    The Monitoring Defendants also had a duty to ensure that the members of the Committees possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Company.

144.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committees or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committees' imprudent actions and omissions.

145.    As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

146.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT III
### Prohibited Transactions
### (Against All Defendants)

147.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

148.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

149.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

39

150.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

151.    Defendants' decision to agree to pay excessive fees to Great-West/Empower as recordkeeper for the Plans amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

152.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plans, are liable to restore to the Plans all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of

the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plans' fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: September 25, 2025           Respectfully submitted,

/s/ *Jeffrey Hellman*
Jeffrey Hellman
BBO # 549896
**Law Offices of Jeffrey Hellman, LLC**
195 Church Street, 10th Floor

41

New Haven, CT 06510
Email: jeff@jeffhellmanlaw.com
Tel.: (203) 691-8762
Fax: (203) 823-4401

Mark K. Gyandoh, Esquire
James A. Maro, Esquire
PA Attorney ID #88587
PA Attorney ID #86420
(*Admissions Pro Hac Vice to be Requested*)
**Capozzi Adler, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Email: jamesm@capozziadler.com
Tel: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*